# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
#### No. 5:25-CV-00043-M-RN

**Angie Kieliszewski**, et al.,

               Plaintiffs,

v.

**Relias, LLC**,

               Defendant.

**Memorandum & Recommendation**

Plaintiffs Angie Kieliszewski and LynnAnn Ware claim that Defendant Relias, LLC violated their rights under the Video Privacy Protection Act by sharing information about videos they accessed on Relias's website with Meta Platforms, Inc. Relias counters that Plaintiffs' claims should be dismissed because they lack standing as their alleged harm is not concrete enough to satisfy the Constitution's requirements to sue in federal court.

After considering the law, the record, and the parties' arguments, the undersigned concludes that Plaintiffs lack standing to sue. To establish that they have standing, Supreme Court precedent requires them to show that the intangible harm they allegedly suffered is analogous to a harm traditionally recognized as providing a basis to sue in American courts. Plaintiffs try to meet this burden by pointing to the common law torts of public disclosure of private facts and intrusion upon seclusion.

But the harms addressed by those torts are not sufficiently analogous to the harm Plaintiffs allegedly suffered to give them standing. They cannot rely on public disclosure of private facts as an analog because Relias did not publicly disclose or widely disseminate their information. And their attempt to draw a comparison to the tort of intrusion upon seclusion is unpersuasive because

there is no allegation that the information was used to direct advertising at them. So the District Court should grant Relias's motion to dismiss for lack of subject-matter jurisdiction.

## I.      Background

Plaintiffs are Pennsylvania residents who have both used Nurse.com, a website run by Relias, to request and obtain continuing education courses containing audio and video materials. Am. Compl. ¶¶ 16, 27, D.E. 9. Before doing so, they had to provide Relias with information, including their names. *Id.* ¶¶ 13, 23. They then accessed the courses on an unspecified, "Internet-connected device and web-browsing software installed on that device." *Id.* ¶¶ 16, 26.

Unbeknownst to Plaintiffs, Relias used the Meta Pixel on its sites. The Meta Pixel "is a unique string of code that companies can embed on their websites[.]" *Id.* ¶ 60. When someone visits a website that uses the Pixel, the website instructs the user's web browser to load the Pixel along with the rest of the site's content. *Id.* ¶ 62. Once installed, the Pixel instructs the user's web browser to send information about the visitor's activity to Meta. *Id.* ¶ 63. The reported information can include the pages the visitor viewed, buttons they clicked, items they added to their virtual shopping cart, and purchases they made. *Id.* ¶¶ 63, 64. This information is transmitted to Meta in the form of a URL. *Id.* ¶ 63.

If a person visiting a website has a Facebook account, the Pixel allows Meta to link the visitor to that account through a unique identifier, referred to as an FID, assigned to each Facebook user. *Id.* ¶¶ 61, 67. It obtains this information by instructing the visitor's web browser to send the FID information to Meta. *Id.* ¶ 63. Meta then uses this information to help companies like Relias "build detailed profiles about their consumers and serve them with highly targeted advertising." *Id.* ¶ 60. The FID is sent to Meta in the same URL as the information about the visitor's activity on the site. *Id.* ¶ 69.

2

Since Plaintiffs both have Facebook accounts, the Pixel's presence on Relias's website means that Meta can learn "the name of the video content" they "requested or obtained" on those sites. *Id.* ¶ 70. It will receive their FIDs at the same time, so it can link Plaintiffs to "the audio visual materials requested, obtained[,] or purchased" from Relias's sites. *Id.* ¶ 83. The Pixel, coupled with a companion technology called "CAPI" (which functions similarly to the Pixel but uses data from the website instead of the consumer), meant that Meta or anyone with the code disclosed by Relias to Meta, could discover what videos Kieliszewski and Ware watched. *Id.* ¶¶ 72–74.

Each Plaintiff contends that by installing the Pixel on its sites and causing their information to be sent to Meta, Relias violated her rights under the Video Protection Privacy Act and "invaded her statutorily conferred right to keep such information (which bears on her personal affairs and concerns) private." *Id.* ¶¶ 20, 30. That Act prohibits providers of prerecorded audio-visual materials from disclosing personally identifiable information about someone who requests or obtains video materials from the provider. 18 U.S.C. § 2710(b)(1). Plaintiffs say that by sending information to Meta that allows it to know which videos they accessed, Relias violated the VPPA. They seek to represent a class of people who used Relias's website and were subject to similar disclosures. They seek statutory damages of $2,500 per class member.

Relias responded to Plaintiffs' Amended Complaint by asking the court to dismiss this action due to a lack of subject matter jurisdiction. The court then requested supplemental briefing and held a hearing on the motion.

## II. Discussion

The parties dispute whether Relias's alleged actions caused Plaintiffs to suffer a concrete injury. If they did not, then they do not have standing to pursue their claims in federal court. That

inquiry turns on whether the harm they allegedly suffered is closely analogous to a harm traditionally recognized as providing a right to sue in American courts. This opinion begins by providing an overview of the relevant aspects of the standing doctrine and then examines whether Plaintiffs' allegations give this court the ability to hear their claims.

### A. Standard for a Rule 12(b)(1) Motion

The Federal Rules allow a party to argue that a matter should be dismissed because the court lacks subject-matter jurisdiction to hear it. Fed. R. Civ. P. 12(b)(1). Challenges to a court's subject matter jurisdiction can take one of two forms. *Adams* v. *Bain*, 697 F.2d 1214, 1219 (4th Cir. 1982). First, a party may argue that the allegations in the complaint do not establish subject-matter jurisdiction. *Id.* In this case, the court should assume that the factual allegations in the complaint are true when considering the motion. *Id.*

Second, a party may challenge the veracity of the facts that establish the court's jurisdiction. In this case, the court may consider matters outside the pleadings, including, "evidence by affidavit, depositions[,] or live testimony" to determine whether the plaintiff has properly established subject matter jurisdiction. *Id.* When approaching a motion to dismiss for lack of subject-matter jurisdiction in this posture, a court should only dismiss the case "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R. Co.* v. *United States*, 945 F.2d 765, 768 (4th Cir. 1991).

Regardless of the form of the dispute, the party invoking the court's jurisdiction, in this case Plaintiffs, bears the burden of proving that the court has the authority to hear the case. *Adams* 697 F.2d at 1219. If a party cannot meet their burden, the court must dismiss the case. Fed. R. Civ. P. 12(h)(3).

As the Amended Complaint's allegations are sufficient to resolve Relias's motion, this opinion does not consider the additional materials it submitted.

**B.      Separation of Powers and Standing**

The United States Constitution vests each branch of the federal government with a distinct set of powers. U.S. Const. Art. I § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States[.]"); Art II. § 1 ("The executive Power shall be vested in a President of the United States of America."); Art. III § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."). No branch may act beyond the authority the Constitution grants it. *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 337 (2016).

And for good reason. It has long been recognized that the "accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." *The Federalist* No. 47, at 298 (James Madison) (Clinton Rossier ed., 1961).

The Constitution limits the authority of federal courts to specified types of "cases" and "controversies[.]" U.S. Const. Art. III § 2; *Sheppheard* v. *Morrisey*, 143 F.4th 232, 242 (4th Cir. 2025). As a result, before a party can proceed in federal court, it must show that the matter it wants the court to resolve falls within these categories. To do so, it must satisfy the court that its allegations meet the "irreducible constitutional minimum" for a dispute to constitute a "case" or "controversy." *Lujan* v. *Def. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation omitted). First, there must be an injury that is "concrete and particularized" and "actual or imminent[.]" *Id.* Second, there must be a causal link between the injury and the defendant's actions. *Id.* And finally, the court must have the ability to redress the injury with a decision favorable to the plaintiff. *Id.* at 561.

In other words, when the court asks a plaintiff, "What's it to you?" she must have a good answer. Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983). But simply pointing to a congressionally created cause of action is not a good enough answer. *Gladstone Realtors* v. *Vill. of Bellwood*, 441 U.S. 91, 100 (1979) ("In no event . . . may Congress abrogate the Art. III minima[.]"). So even if Congress has given a party a right to sue, that party must still show that its claim qualifies as a case or controversy under the Constitution.

In recent years, the Supreme Court has sought to explain the limits of Congress's ability to create a cause of action that is actionable under Article III. For example, in *Spokeo* v. *Robins,* the Court examined whether a plaintiff has standing to sue under the Fair Credit Reporting Act. 578 U.S. at 333. The FCRA imposes various procedural and substantive requirements on credit reporting agencies, including the requirement that they follow certain procedures to ensure the accuracy of information they provide. *Id.* at 334–35. It also provides individuals with the ability to sue a credit reporting agency that willfully fails to meet its FCRA obligations for damages. *Id.* at 335.

Robins alleged that Spokeo, a company alleged to be a credit reporting agency, created a profile of him on its webpage that included inaccurate information about him. *Id.* at 336. After learning about the existence of this inaccurate information, Robins brought a class action complaint against Spokeo for allegedly violating the FCRA. *Id.* at 333.

The Supreme Court addressed whether Robins's alleged injuries were sufficiently concrete to give him standing to sue. *Id.* at 340. "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* As the Court noted, although Robins's alleged harm was intangible, "intangible injuries can nevertheless be concrete." *Id.*

But, the Court explained, just because "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right" does not mean that the person has suffered a concrete injury. *Id.* at 341. Instead, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* Allegations of "a bare procedural violation, divorced from any concrete harm," does not establish Article III standing. *Id.*

The Supreme Court recognized that by enacting the FCRA, "Congress plainly sought to curb the dissemination of false information by adopting procedures designed to decrease that risk." *Id.* at 342. Since a "violation of one of the FCRA's procedural requirements may result in no harm[,]" a plaintiff "cannot satisfy the demands of Article III by alleging a bare procedural violation." *Id.* It then remanded the case for consideration of whether, under the standard it announced, Robins had alleged a concrete injury. *Id.* at 342–43.

A few years later, the Supreme Court returned to this issue in *TransUnion, LLC* v. *Ramirez*, 594 U.S. 413 (2021), another FCRA case. Ramirez claimed he had been erroneously added to a list of individuals who pose a national security threat maintained by the Treasury Department's Office of Foreign Assets Control ("OFAC"). *Id.* at 419. When a car dealership obtained Ramirez's credit report from TransUnion, the report warned that he was on the OFAC list. *Id.* at 420. With that information in hand, the dealership refused to sell him a car. *Id.*

Ramirez then sued TransUnion for violating the FCRA. *Id.* at 421. He claimed the company violated that law by failing to follow reasonable procedures to ensure the accuracy of the information in his credit file, failing to provide him with all the information in his credit file upon request, and failed to include a summary of his rights in one of its mailings to him. *Id.* He sought to represent a class of nearly 8,200 similarly situated individuals. *Id.* TransUnion unsuccessfully challenged his standing to bring these claims in the lower courts. *Id.* at 422.

7

As in *Spokeo*, the question in *TransUnion* was whether Ramierz had suffered a concrete injury. *Id.* at 424. The Supreme Court again noted that "Congress's creation of a statutory prohibition or obligation and a cause of action" did not automatically satisfy Article III's requirement that a plaintiff suffers concrete harm. *Id.* at 426. "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 427 (emphasis in original).

The Court explained that in *Spokeo* it had "indicated that courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* It said that this "inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* A plaintiff need not identify "an exact duplicate in American history and tradition" to satisfy this test. *Id.* at 424–25. But if the plaintiff's theory "circumvents a fundamental requirement" of the tort proposed as historical analogue, that tort "does not bear a sufficiently 'close relationship'" to the plaintiff's harm "to . . . qualify for Article III standing." *Id.* at 435 n.6.

Applying these principles, the Supreme Court concluded that with respect to the inaccurate information in their credit files, some class members had suffered a concrete injury, but some had not. In its view, class members whose inaccurate credit reports had been disseminated to third parties suffered a concrete injury closely analogous to defamation. *Id.* at 432. But it was a different story for class members who had not had the inaccurate information in their credit files shared with a third party. *Id.* at 433–34. In the Supreme Court's assessment they lacked standing because "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 434.

The Supreme Court also concluded that no class member had established that they suffered a concrete injury because of TransUnion's failure to provide them with a complete copy of their credit files or its alleged failure to provide them with a summary of their rights. *Id.* at 439–40. The plaintiffs had not established that the harm they allegedly suffered any harm at all, let alone a harm with "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 440. Without making that showing, plaintiffs alleged only "bare procedural violation[s], divorced from any concrete harm." *Id*.

With these standards in mind, this opinion considers whether Plaintiffs' Amended Complaint establishes that they suffered concrete harm.

### C.     The Video Privacy Protection Act

Plaintiffs alleged harms arise out of the VPPA. That law provides a civil remedy for unauthorized disclosures of a "consumer['s] . . . personally identifiable information" by a "video tape service provider[.]" 18 U.S.C. § 2710(b)(1). The VPPA provides that a "video tape service provider" is "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" *Id.* § 2710(a)(4). The statute defines a consumer as "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" *Id.* § 2710(a)(1). And "personally identifiable information" means "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]" *Id.* § 2710(a)(3). The statute says that if such a provider knowingly discloses protected information, it is civilly liable for a minimum of $2,500. *Id.* § 2710(b)(1), (c)(2).

Plaintiffs claim that Relias's use of the Pixel and the resulting transmission of their information to Meta violated the VPPA. They say Relias harmed them harm because its actions

9

"invaded [their] statutorily conferred right to keep such information (which bears on [their] personal affairs and concerns) private." Am. Compl. ¶¶ 20, 30. So the court must assess whether that harm bears a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts.

### D. Public Disclosure of Private Facts

Kieliszewski and Ware first argue that their alleged harm bears a close relationship to the harm addressed by the common law tort of public disclosure of private facts. Resp. in Opp'n at 15–20, D.E. 22. Relias, however, disagrees. It notes that this tort redresses the harm caused by broad dissemination of private information, and there is no allegation that Plaintiffs' information was shared with anyone other than Meta. Reply at 9, D.E. 23.

In *Holmes* v. *Elephant Insurance Co.*, 156 F.4th 413 (4th Cir. 2025), the Fourth Circuit examined how a plaintiff can establish that their alleged harm is sufficiently analogous to the harm addressed by the tort of public disclosure of private facts to show that she suffered a concrete injury. The appellate court noted that this tort "requires that the defendant (1) disclose (2) to the public (3) true but private information that would be highly offensive to a reasonable person and (4) is otherwise of no legitimate concern to the public." *Id.* at 423. It then dug into three of those elements to assess the type of harm the tort sought to prevent. *Id.*

The tort's elements show that it covers only the harm caused by disclosures of certain types of information: that which has no legitimate public interest and that which the reasonable person would find highly offensive if they learned it had been shared. *Id.* at 424. At its core, the tort protects against the harm occasioned by disclosure of "inherently shameful" information like "sexual relations, family quarrels, and humiliating illness." *Id.* at 423 (quotation modified). But it also protects against the harm caused by the disclosure of less salacious private information like

tax returns. *Id.* As a result, "only sensitive personal information falls within the scope of the tort." *Id.* at 424. A plaintiff does not suffer actionable harm from the sharing of "[o]ther pieces of nonsensitive personal information[.]" *Id.*

Just as it does not cover the harm caused by the sharing of all types of personal information, the tort also does not provide relief for the harm caused by every type of disclosure. *Id.* Instead, the "tort is only implicated when the sharing is so broad that it 'reaches, or is sure to reach, the public.'" *Id.* (quoting Restatement (Second) of Torts § 652D cmt. a). For the purposes of this tort "[p]ublicity is given to information 'broadcast over the radio,' or given 'to a large audience,' or published 'in a newspaper or a magazine, even of small circulation,' but not to statements made 'to a small group of persons.'" *Id.* (quoting Restatement (Second) of Torts § 652D cmt. a). So, "the public disclosure of private information is aimed at the harm that occurs when sensitive personal information is released into the open." *Id.*

Considering these elements, the Fourth Circuit laid out several principles to guide whether, for standing purposes, a plaintiff suffered harm similar to that addressed by the tort of public disclosure of private facts. To begin with, "the public disclosure of private information tort makes concrete the intangible harm suffered when information that the plaintiff would justifiably prefer to tightly control is released into the open." *Id.* at 425. Next, "the information need not be embarrassing or salacious," but "the plaintiff must have good reason to keep it close to the vest." *Id.* And finally "though the information need not be broadcast to the whole world, it must be accessible to many." *Id.*

Under *Elephant Insurance*, Kieliszewski and Ware have not shown that their alleged harm is closely enough related to the harm addressed by the tort of public disclosure of private facts to establish standing. The crux of Plaintiffs' allegations is that Relias shared their information with

Meta. Am. Compl. ¶ 9. Alleging that their information was shared with a single entity falls well short of alleging that their information was made public or was sure to reach the public.

Plaintiffs argue that the element of publicity is met here because while Meta is only a single company, it is an extremely large one. Hr'g Tr. at 5:11–19. They point out that the Second Circuit found that, for standing purposes, Meta's size was relevant to the publication requirement of public disclosure of private facts. *Salazar* v. *Nat'l Basketball Ass'n*, 118 F.4th 533, 543 (2d Cir. 2024). While Meta's size was one of several factors the Second Circuit considered, neither that opinion, nor Plaintiffs explain how disclosing information to one company, even a large one, meets the tort's requirement that private information be "made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D cmt. a.

Since their allegations "do not provide any reason to think that" information about their viewing choices is "now generally accessible[,]" their harm "does not bear a close relationship to the harm addressed by the public-disclosure tort." *Elephant Ins.*, 156 F.4th at 425. Instead, "it is a harm different in kind, not degree, from that addressed by the common-law tort." *Elephant Ins.*, 156 F.4th at 425. *Accord Nabozny* v. *Optio Sols.,* LLC, 84 F.4th 731, 736 (7th Cir. 2023) ("The transmission of information to a single ministerial intermediary does not remotely resemble the publicity element of" this tort.).

Plaintiffs' attempt to draw a close relationship to the public disclosure tort is also hamstrung by the lack of an allegation that anyone actually saw the information transmitted to Meta.[1] The publicity element of public disclosure of private facts generally requires that the

---

[1] While the information transmitted to Meta is allegedly used to enable advertisers to target website visitors with advertisements, Am. Compl. ¶ 81, Plaintiffs do not allege that Meta shares information about the specific audio visual material a visitor requested or obtained with advertisers.

information at issue was "actually read and not merely processed[.]" *TransUnion*, 594 U.S. at 434 n.6. Without alleging that someone actually learned the content of the information Relias transmitted, Plaintiffs cannot draw the necessary analogy between their alleged harm and the harm addressed by public disclosure of private facts. *Hunstein* v. *Preferred Collection & Mgmt. Servs., Inc.*, 48 F. 4th 1236, 1247 (11th Cir. 2022) ("Transmitting information that no one reads or perceives is not publicity.").

Since Plaintiffs have not alleged that their information was made public or otherwise widely disseminated, they cannot show a fundamental requirement of the tort of public disclosure of private facts is present here. As a result, their alleged harm does not bear a sufficiently close relationship to the harm addressed by that tort to establish Article III standing.

### E.      Intrusion Upon Seclusion

Kieliszewski and Ware next try to analogize the harm they allegedly suffered to the harm addressed by the common law tort for intrusion upon seclusion. Pl.'s Resp. to Order at 11. Relias says that disclosure without more cannot support using intrusion upon seclusion to demonstrate concrete harm. Def.'s Resp. to Order at 10, D.E. 29.

The tort of intrusion upon seclusion imposes liability on someone "who intentionally intrudes . . . upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. Unlike the tort of public disclosure of private facts, intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded or to his affairs." *Id.* § 652B cmt. a. Instead, it guards against the invasion into a person's private affairs either by "physical invasion" or "by some other form of investigation or examination[.]" *Id.* § 652B cmt. b.

Intrusion upon seclusion protects against a narrow type of harm. It is not seeking to address the harm caused by "disclosure of sensitive information as such[.]" *Am. Fed. of Tchrs.* v. *Bessent*, 152 F.4th 162, 172 (4th Cir. 2025). Nor is it guarding against the harm caused by disclosure of private information. *Id.* Instead, it "has long been understood to guard . . . against the feeling of unease when and where one should ideally be at peace." *Id.* (citing Restatement (Second) of Torts § 652B cmt. a). In other words, "it is not the information obtained, but the knowledge that a third party is engaged in targeted snooping, that causes the harm." *Id.*

A few examples will help clarify the nature of the harm this tort seeks to address. Intrusion upon seclusion provides a remedy for the "harm . . . felt when a reporter accosts a convalescing patient in the hospital, when a private detective peers through a bedroom window for weeks, and when a photographer snaps an opportunistic photo of a woman's underwear." *Bessent*, 152 F.4th at 172 (citing Restatement (Second) of Torts § 652B cmt. b, illus. 1, 2; cmt. c, illus. 7). Similarly, it provides a vehicle to redress the disturbance caused by a telemarketer repeatedly pestering someone who has placed their phone on a do-not-call list. *Krakauer* v. *Dish Network*, 925 F.3d 643 (4th Cir. 2019). And it allows recovery for the annoyance caused by the receipt of unsolicited mailings that result from the improper use of the recipient's personal information. *Garey* v. *James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022).

The harm that Kieliszewski and Ware allegedly suffered is distinct from the harm that intrusion upon seclusion seeks to remedy. Each Plaintiff alleges that Relias violated her "rights under the VPPA and invaded her statutorily conferred right to keep such information (which bears on her personal affairs and concerns) private." Am. Compl. ¶¶ 20, 30. But intrusion upon seclusion does not guard against the harm caused by "the disclosure of sensitive information as such[.]"

14

*Bessent*, 152 F.4th at 172. So the harm caused by the disclosure of their information to Meta is not sufficiently analogous to intrusion upon seclusion to establish a concrete injury.

Of course, the Fourth Circuit has found a plaintiff suffered a concrete injury when his private information was unlawfully obtained and used to intrude on his home life. In *Krakauer*, the intrusion came in the form of unwanted phone calls. And in *Garey*, the intrusion took the form of unrequested solicitations.

But Plaintiffs' concede that they have not alleged that Relias's disclosure of their information to Meta resulted in any advertising being directed at them at all. Hr'g Tr. at 39:4–9. So without an allegation that the sharing of their personal information resulted in some disruption of or intrusion into their lives, they cannot establish a harm analogous to intrusion upon seclusion.

Plaintiffs note that several courts have found that sharing information about an individual's viewing history constitutes concrete harm analogous to intrusion upon seclusion that is actionable under the VPPA. *Pileggi* v. *Washington Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1228 (D.C. Cir. 2025); *Salazar* v. *Paramount Glob.*, 133 F.4th 642 (6th Cir. 2025), *cert. granted*, --- U.S. ---, 2026 WL 189831 (Jan. 26, 2026) (No. 25–459); *Eichenberger* v. *ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017); *Perry* v. *Cable News Network, Inc.*, 854 F.3d 1336 (11th Cir. 2017); *Sterk* v. *Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014).

Those cases, however, cannot compel a different result because Fourth Circuit precedent forecloses Plaintiffs' ability to draw the necessary analogy between their alleged harm and the harm addressed by intrusion upon seclusion. *Bessent* instructs that intrusion upon seclusion requires more than the disclosure of sensitive information, so Plaintiffs cannot rely solely on the fact that Relias shared their information with Meta. *Krakauer* and *Garey* require that improper disclosure results in some intrusion into the Plaintiffs' personal lives before intrusion upon

15

seclusion provides the necessary basis to establish a concrete injury. Allegations of that nature are absent here. So holdings from other circuits cannot salvage the Plaintiffs' attempt to establish standing.

### III.    Conclusion

Plaintiffs claim that Relias violated their rights under the VPPA by disclosing information to Meta about the videos they accessed on Relias's website. But their alleged harm does not bear a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. As a result, they have not established that they have suffered the type of concrete injury necessary to establish standing to sue in federal court. Thus the District Court should grant Relias's motion (D.E. 17) and dismiss the Amended Complaint. D.E. 9.

The Clerk of Court must serve a copy of this Memorandum and Recommendation ("M&R") on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated:  January 30, 2026

_Robert T Numbers II_

Robert T. Numbers, II
United States Magistrate Judge

16